PRESIDING JUSTICE WILSON
 

 delivered the opinion of the court:
 

 Following a jury trial, defendant was convicted of murder and two counts of attempted murder (Ill. Rev. Stat. 1981, ch. 38, pars. 9— 1(a), 8 — 4, respectively), and sentenced to concurrent terms of 40 years, 20 years and 20 years in the Illinois Department of Corrections. Defendant appeals, contending that: (1) the trial court erred in denying motions to quash arrest and to suppress his confession; (2) defendant was denied a fair trial when the prosecution showed an inflammatory photograph of the deceased to the jury in violation of a ruling in limine-, and (3) the State’s inflammatory and highly improper statements made during opening statement and closing argument prejudiced defendant’s right to a fair trial. For the reasons that follow, we affirm the trial court’s judgment.
 

 On August 9, 1980, approximately 1 a.m., while walking east on Addison Street, near Wrigley Field, in Chicago, Jose Ortiz, Carmen Santana and Michael Parades were shot by the front seat passenger of an automobile traveling west on Addison. As a result, Ortiz died from a gunshot wound to the neck and Santana and Parades suffered multiple gunshot wounds. Later that day, an unidentified informant called the Chicago police and told them that Jose Rivera, a member of the Puerto Rican Stones street gang, knew something about the shootings. Based on the informant’s tip, approximately 7 p.m. that evening, the police arrested Rivera as a suspect in the shooting. While in custody, Rivera told the police that he was at a party at Mario Gonzalez’ apartment the previous evening where he overheard Gonzalez, Frank Perez and defendant discussing their intention to “burn some birds,” which is street language for “shoot some members of the Latin Eagles.” Rivera further stated that Gonzalez and defendant left the party approximately 12:30 a.m. The shootings occurred a half hour later approximately two miles from Gonzalez’ apartment. As a result of Rivera’s statement, the police arrested Gonzalez, Perez and defendant, without a warrant, in the early morning hours of August 10.
 

 Prior to trial, defendant moved to quash his arrest on the ground that information leading to his arrest was obtained from an unreliable informant who himself was under arrest as a suspect in the shootings at the time he gave the exculpatory statement. Further, defendant moved to suppress his confession on the ground that there had not been an attenuation of the improper arrest at the time he gave his statement. Upon request by the State, arguments on both motions were heard concurrently.
 

 Investigator Raymond Siwek of the Chicago police department testified that on August 9, approximately 7 p.m., he and his partner, Investigator Konior, located Jose Rivera at the corner of Barry and Wilton in Chicago and arrested him as a suspect in the shootings. While in custody, Rivera told the investigators about the conversation he had overheard in Mario Gonzalez’ apartment. After speaking with Rivera, Siwek reviewed the case report which contained a description of the vehicle involved in the shootings as well as a description of the occupants of the vehicle, obtained photographs of Gonzalez, Perez and defendant from the police files and proceeded to Gonzalez’ apartment where Rivera said Gonzalez, Perez and defendant could be found. Approximately 1 a.m., August 10, defendant exited the apartment with three other individuals, entered an automobile, and drove away. Siwek and Konior stopped the automobile about a block away, identified themselves, asked defendant to identify himself, arrested him and advised him of his rights. After a transport vehicle arrived to take defendant to police headquarters, Siwek and Konior returned to their surveillance posts in front of Gonzalez’ apartment and continued to observe until assisting units arrived, at which time they arrested Gonzalez and Perez.
 

 Upon their return to police headquarters, approximately 3 a.m., after reading defendant his Miranda rights, Siwek and Konior interviewed him for the first time. Later that evening, approximately 8:30 p.m., Siwek again advised defendant of his rights and interviewed him in Konior’s presence. At Siwek’s third interview with defendant, approximately midnight, defendant confessed to the shootings, after which he requested and was granted permission to make a phone call. To Siwek’s knowledge, defendant was never handcuffed, threatened, physically abused or promised leniency. Further, at no time did defendant complain to him of mistreatment. On cross-examination, Siwek testified that prior to Rivera’s arrest, the police had had no information as to the names of other possible suspects.
 

 Detective Gerald Mahon of the Chicago police department testified that on August 10, 1980, he interviewed defendant at police headquarters at 4 a.m. and at 11 a.m. Defendant never requested permission to make a telephone call, and never complained in any manner. On August 11, approximately 2 a.m., Mahon again interviewed defendant in the presence of Assistant State’s Attorney Sherwin. At that time, Mahon asked defendant if he was willing to make a statement and also allowed him to make a phone call. Mahon never saw defendant verbally or physically threatened in any way.
 

 Assistant State’s Attorney Michael Sherwin testified that he interviewed defendant approximately 6:30 p.m. on August 10 in the presence of Officer Manion and again on August 11, approximately 1 a.m., in the presence of Investigator Konior. At no time did defendant complain about mistreatment or state that he was either hungry or thirsty. After the 1 a.m. interview, defendant requested and was granted permission to make a phone call. While he was making the call, Sherwin summoned a court reporter to take defendant’s written statement. However, no written statement was ever given.
 

 Thereafter, the State rested on the motion to quash arrest and stipulated that the automobile in which defendant was riding at the time of his arrest had committed no traffic violations and there were no arrest warrants issued. Following final arguments on the motion to quash arrest, the trial court denied the motion on the following grounds: (1) Rivera was “just a person the police happened to know”; he was not an informant whose reliability must be established; (2) the close time and .distance link between defendant’s departure from the party and the shootings; and (3) the description of the occupants contained in the police report coupled with Rivera’s statement.
 

 Testimony then continued solely as to the motion to suppress defendant’s confession. In this regard, Investigator John Konior of the Chicago police department testified that he had interviewed defendant twice at police headquarters on August 10, approximately 3 a.m. and 8 p.m., and again on August 11, approximately 1:30 a.m. Defendant was advised of his rights at every interview, was never threatened, physically abused or promised leniency. Further, defendant never requested a lawyer. At the conclusion of testimony, the trial court denied defendant’s motion to suppress on the ground that there had been no evidence of involuntariness. Defense counsel then recommenced arguments on the motion to quash arrest, emphasizing that Rivera was not an ordinary citizen and his information had not been corroborated. In affirming its denial of the motion to quash arrest, the trial court stated:
 

 “[Rivera] was taken to the police station at that time because— well, I don’t know the officers’ reason, but the facts were that nobody had been arrested. *** There is really nothing in the evidence to establish that [Rivera] was a person whose reliability had to be established, as would be the case with an informer in the classic sense, so this was not the kind of person giving information whose reliability had to be established or independently corroborated.”
 

 At the commencement of trial, outside the presence of the jury, defendant presented two motions in limine: (1) a request that the State be instructed not to refer to gangs, either in statements given by defendant or by witnesses; and (2) a request that the State be barred from cross-examining witnesses as to their gang membership. In response to the first motion, the State argued that limiting reference to gangs would artificially keep probative evidence from the jury because gang affiliation was the motive for the shooting. Further, the State planned to relate the substance of defendant’s confession which referred to gang retaliation as motive to the jury during its opening statement. The court ruled that the State could refer to gang affiliation in its opening statement only to the extent that the comments would later be proven by the evidence. However, the State could not “set up or dwell upon” gang superstructure, territories or individual gang membership as the real structure of the case.
 

 Regarding defendant’s section motion, the court ruled that the propriety of cross-examination regarding gang membership is better decided as the questions themselves arise. In response, defendant stated that he would have a standing objection to any reference about gangs.
 

 Carmen Santana, a victim of the shootings, then testified that on August 9, 1980, approximately 1 a.m., she, Jose Ortiz and Michael Parades were walking west on Addison, near Sheffield, in Chicago, when a motorcycle drove past them. Although none of the three knew the people on the motorcycle, Michael waved “Hi” in response to their greeting. Immediately after the motorcycle passed, a car pulled up next to them and the front seat passenger started shooting at them. Michael was hit first. Carmen was shot in the arm, twice in the buttocks and once in the back. When she was able to get up, she turned around and saw Jose lying on the ground, holding his neck. She ran toward Jose and stayed with him while Michael left to find help. When the police arrived, they took Carmen and Michael in a squad car to Illinois Masonic Hospital. The following day, the police picked up Carmen and drove her to police headquarters to view a lineup. However, she was unable to identify her assailant.
 

 On cross-examination, Carmen stated that prior to court appearances relevant to this case, she had never seen defendant. During the shooting, the car was stopped for approximately 10 seconds. She noticed that the car was green and that two people were in the front seat.
 

 Next, Michael Parades, a victim of the shooting, testified to substantially the same facts as did Carmen Santana. On cross-examination, Michael stated that he had seen the back end of the dark green vehicle as it was driving away.
 

 Next, Linda Odom testified that on August 8, approximately midnight, her mother awakened her to tell her that Mario Gonzalez had just been knocking at their door. Odom’s mother then asked her to go to Gonzalez’ apartment immediately and tell him not to come over at midnight anymore. Odom drove the three blocks to Gonzalez’ apartment in her 1969 Dodge Polara. WTien she arrived there, she noticed that a party was in progress in Mario’s second floor apartment. She did not go up to the party. Rather, Mario came down to the backyard and asked Odom if he could use her car that night. When she said, “no,” he slapped her in the face. She slapped him back, and he slapped her again and took the car keys out of her jacket pocket. She followed him out to her car and saw Gonzalez get into the driver’s seat and defendant, who was wearing glasses at the time, get into the front passenger seat. Approximately 20 minutes later, Gonzalez returned to his apartment alone. Odom then got her keys and drove home. On cross-examination, Odom stated that she arrived at Gonzalez’ apartment approximately 12:20 a.m.
 

 Next, Dawn Ellis testified that on August 9, 1980, approximately 1 a.m., she and several friends were sitting on the front steps of her house at 3625 North Sheffield, Chicago, when a green car, traveling north on Sheffield, stopped for approximately 20 seconds in front of her house while the front seat passenger looked at Ellis and her. friends. The car then drove north one block to Waveland, turned around and proceeded south on Sheffield. Once again, the car stopped in front of Ellis’ house and she saw the passenger looking toward them through the driver’s window. When he shook his head “no,” the car continued south toward Addison and Sheffield, then turned right on Addison, heading west. Within seconds after the car turned the corner, Ellis heard gunshots and ran to the corner of Sheffield and Addison where she saw Carmen, Jose and Michael lying on the ground. After the police took Carmen and Michael to the hospital, Ellis drove to the hospital with a friend to check on Jose’s condition. The following day, the police drove Ellis to headquarters to view a lineup from which she identified defendant as the passenger of the automobile used in the shooting. Ellis further stated that she recognized defendant from having seen him driving around the neighborhood on previous occasions.
 

 On cross-examination, Ellis testified that while at the hospital on the morning of August 9, she told the police about the automobile in which defendant had been riding, but could not recall whether she had described defendant to the police. Defense counsel then queried Ellis as to an interview he had had with her on August 19, 1981. Ellis denied having stated at that time that defendant had been driving the automobile. On redirect, Ellis stated that no court reporter had been present at the August 19 interview.
 

 Following testimony by Dr. Robert Kirshner regarding injuries suffered by the victims and testimony by Ernest Warner, firearms examiner for the Chicago police department, Dale Woods testified that on August 9, 1980, approximately 1 a.m., he was alone in his car, stopped at a stoplight on the corner of Clark and Addison, facing north, when he heard what he thought were firecrackers being shot off in rapid succession to the east. When he looked in that direction, he saw three people fall to the ground on the north side of Addison and a car driving past them, heading west toward the intersection at which Woods was waiting. When the car drove past him, Woods tried to see what the occupants looked like and to get a description of the car. He noticed that the passenger had on a white t-shirt and wire-rimmed glasses. The driver had a beard. Both were male Latinos in their twenties. Further, from approximately 35 feet away, Woods thought the first two letters on the license plates were “HG.” After the car sped off, Woods flagged down a squad car. Eventually, he followed the police to the hospital where he described the car and its occupants to the police.
 

 On cross-examination, Woods stated that he did not tell the police what the passenger had been wearing. He merely described the occupants as male Latinos in their twenties. Further, Woods told the police that he would be unable to identify the occupants of the car at a lineup.
 

 Next, Detective John Konior of the Chicago police department testified that on August 9, 1980, he received a telephone call at police headquarters from an informant which led him to the arrest of Jose Rivera as a suspect in the shootings. Konior then testified to substantially the same sequence of events leading to defendant’s arrest as did Siwek. At headquarters, approximately 3 a.m. on the morning of defendant’s arrest, Konior and Siwek had a brief conversation with him. Later that evening, following the lineup, Konior informed defendant that he had been identified as a passenger in the front seat of the vehicle used in the shootings. Several hours later, defendant admitted to Konior and Siwek that he had shot Ortiz, Santana and Parades, and related the following sequence of events: on the evening of August 9, while at a party in Mario Gonzalez’ apartment with other members of the Puerto Rican Stones, defendant and some others were discussing the Latin Eagles, a rival street gang, and the shootings and other acts of aggression committed against members of the Stones by the Eagles within the past few months. Several of the Stones then decided to go out and “burn some of the birds,” i.e., shoot some members of the Eagles. Defendant, armed with a .38 revolver, and Gonzalez then drove to the Wrigley Field area where they saw two guys and a girl walking near Sheffield and Addison. When one of the two guys saluted a member of another gang who rode by on a motorcycle, defendant told Gonzalez to pull up alongside the threesome and defendant then fired six shots at them. After Gonzalez dropped defendant at his house, defendant put the gun in a paper bag and left it at a nearby elevated station. When defendant completed his confession, Konior called Assistant State’s Attorney Sherwin into the room and defendant repeated his statement. Although the gun was never located, the police did locate the automobile used in the shooting which had license plate number RC 9447.
 

 On cross-examination, Konior stated that Jose Rivera was the first person arrested as a suspect in the shootings. Defendant was in custody approximately 10 hours before making the admission. Although he originally agreed to put his statement in writing, he later refused. However, the admission did appear in the police report.
 

 Thereafter, a discussion ensued regarding admission of evidence during which defense counsel objected to admission of a photograph of Ortiz’ bloodied face on the ground that it was prejudicial and would serve only to inflame the jury. The trial court ruled that the photograph would be received into evidence, but would not go to the jury because “[i]t’s very gory and distorted and I don’t see any necessity for it to go to the jury.”
 

 Next, Michael Sherwin, assistant State’s Attorney, testified that on August 11, approximately 1 a.m., in the presence of Investigator Konior, defendant confessed to the shootings. After giving his confession, defendant stated that he would give a written statement after he called his girlfriend and his future mother-in-law. However, after he made the call, defendant declined to give a written statement. The State then rested its case.
 

 Dianne Kehl testified on behalf of defendant that on August 9, approximately 1 a.m., while waiting for a bus at Clark and Addison, she saw three people get shot by an occupant of a moving vehicle. As soon as it happened, she threw herself down on the sidewalk. However, she was able to see that the vehicle contained three people and that the front passenger had neither black hair nor any facial hair.
 

 On cross-examination, Kehl admitted that she did not get a good look at the passenger’s face and that she was not sure about the facial hair. Further, the passenger could have been a Latino. Kehl then described the automobile used in the shooting as a light-colored, older-model car. When shown a picture of Odom’s car, Kehl stated that it could have been the car used in the shooting.
 

 Thereafter, defense counsel stipulated that if Robert Boharic, attorney, were to testify he would state that during his interview of Dawn Ellis on August 19, 1981, Ellis told him three times that defendant had been the driver of the car used in the shootings. However, Boharic took no notes at the interview; no court reporter was present; Boharic’s summary was prepared entirely from memory; and the final document was never given to Ellis to read and sign. Defendant then rested his case.
 

 Following closing arguments, defendant moved for a mistrial based on the State’s display of the photograph of Ortiz’ bloodied face to the jury during closing argument. Defendant argued that this was in violation of the court’s ruling that the photograph was not to go to the jury. The court denied the motion, stating that the photograph could have gone to the jury, but that it was unnecessary given the totality of the evidence.
 

 Subsequently, the jury returned with its verdict, finding defendant guilty of the murder of Jose Ortiz and the attempted murder of Carmen Santana and Michael Parades. Judgment was entered on the verdict. All post-trial relief was thereafter denied and defendant was sentenced to concurrent terms of 40 years for murder and 20 years for each attempt conviction. Defendant’s timely appeal followed.
 

 Opinion
 

 We shall first address defendant’s contention that the trial court erred in denying his motions to quash arrest and suppress confession on the grounds that information leading to his arrest was supplied by an informant of the criminal milieu whose reliability had not been established, thus precluding grounds for probable cause. In support of his argument, defendant relies on the test for establishing probable cause based on an informant’s tip set forth in Aguilar v. Texas (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509, and Spinelli v. United States (1969), 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (Aguilar-Spinelli test). Pursuant to the Aguilar-Spinelli test, satisfaction of a two-pronged analysis is required to establish probable cause to arrest a defendant based on an informant’s tip. First, the informant must state his basis for belief that a crime has been committed (basis of knowledge prong). Second, there must be underlying circumstances from which the officer can conclude that the informant’s information was reliable (veracity prong). Spinelli also set forth an exception which allows corroboration of facts in a tip to compensate for an inability to satisfy the “basis of knowledge” prong.
 

 Recently, however, the United States Supreme Court abandoned the Aguilar-Spinelli test for probable cause which it felt “encouraged an excessively technical dissection of informants’ tips, with undue attention being focused on isolated issues that cannot sensibly be divorced from the other facts” and adopted a “totality of circumstances analysis, which permits a balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending an informant’s tip.” Illinois v. Gates (1983), 462 U.S. _, _, 76 L. Ed. 2d 527, 545-46,103 S. Ct. 2317, 2330.
 

 In Gates, on May 3, 1978, the Bloomingdale, Illinois police department received an anonymous handwritten letter in the mail which informed them that Sue and Lance Gates, residents of Bloomingdale, were drug dealers who made most of their buys in Florida. The letter explained that Sue drives their car to Florida, drops it off, then flies home. A few days later, Lance flies to Florida, picks up the car which is loaded with drugs and drives back to Bloomingdale. In addition, the letter stated that on May 3, Sue Gates would be driving to Florida and Lance would be flying there a few days later to pick up the car which would be loaded with over $100,000 in drugs.
 

 Upon pursuing the tip, the police learned that an Illinois driver’s license had been issued to a Lance Gates, residing in Bloomingdale, and that an L. Gates had made a reservation on an Eastern Airlines flight to West Palm Beach, Florida, scheduled to depart from Chicago on May 5 at 4:15 p.m. Surveillance of the airport by an agent of the Drug Enforcement Administration revealed that Gates had boarded the flight. Federal agents in Florida observed him arrive in West Palm Beach and take a taxi to a nearby motel where Susan Gates had a room registered in her name. The following day, Gates and a woman left the motel in a car which had Illinois license plates registered to Gates and proceeded north on an interstate highway. The Bloomingdale police were advised that the trip from West Palm Beach to Bloomingdale would take approximately 24 hours. In the interim, a signed affidavit setting forth the foregoing facts, together with a copy of the anonymous letter, were submitted to a judge of the circuit court of Du Page County who then issued a search warrant for the Gates’ residence and automobile.
 

 When Lance and Susan Gates arrived at their home in Bloomingdale, the Bloomingdale police were waiting for them and proceeded to search the car and the house, uncovering large quantities of marijuana, weapons, and other contraband. The circuit court ordered suppression of these items on the ground that the affidavit failed to support the necessary determination for probable cause set forth in the Aguilar-Spinelli test. The appellate and supreme courts affirmed.
 

 In reversing the Illinois Supreme Court, the United States Supreme Court agreed that the anonymous letter by itself could not provide the necessary basis for probable cause because it contained no information as to the honesty of the author, the reliability of the information, or the basis for the predictions. However, the court disagreed with the Illinois Supreme Court’s application of the Aguilar-Spinelli test to the affidavit. In this regard, the court stated:
 

 “We agree with the Illinois Supreme Court that an informant’s ‘veracity,’ ‘reliability’ and ‘basis of knowledge’ are all highly relevant in determining the value of his report. We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case ***. Rather, *** they should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is ‘probable cause’ to believe that contraband or evidence is located in a particular place.
 

 This totality of the circumstances approach is far more consistent with our prior treatment of probable cause than is any rigid demand that specific ‘tests’ be satisfied by every informant’s tip.” Illinois v. Gates (1983), 462 U.S. _, _, 76 L. Ed. 2d 527, 543-44,103 S. Ct. 2317, 2327-28.
 

 After careful review of the facts at bar, we find that application of the “totality of circumstances” analysis supports the trial court’s finding of probable cause for defendant’s arrest. Although we agree with defendant that the trial court erred in its conclusion that Rivera had not been in custody at the time his statement was given, we find that fact to be merely one of the indicia of reliability which must be balanced, not the determinative indicium. As the United States Supreme Court stated in Gates, “[E]ven if we entertain some doubt as to an informant’s motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand entitles his tip to greater weight than might otherwise be the case.” (462 U.S. _, _, 76 L. Ed. 2d 527, 545, 103 S. Ct. 2317, 2329-30.) In the present case, Rivera personally overheard defendant’s conversation regarding shooting members of the Latin Eagles. Further, his description of the conversation, defendant’s departure from the party and the location where defendant could be found were explicit and detailed.
 

 Using the two-prong test as a guide rather than as a strict formula in accordance with Gates, we note initially that the /‘basis of knowledge” prong was never at issue in the case at bar. Rather, defendant’s primary contention is that the informant’s credibility and the reliability of the information (components of the “veracity” prong) had never been established. In analyzing this contention, we look to the totality of the circumstances, noting that “a deficiency in one [prong] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.” 462 U.S. _, _, 76 L. Ed. 2d 527, 545, 103 S. Ct. '2317, 2329.
 

 The facts reveal that shortly after the shootings occurred, Dale Woods, an eyewitness, described the events to the police, stating that the passengers in the vehicle used in the shooting were “male Latinos, in their twenties.” The following day, based upon the informant’s tip, the police arrested Jose Rivera as a suspect in the shootings. While in custody, Rivera told the police that at a party the previous night, he had overheard Gonzalez, Perez and defendant discuss shooting members of the Latin Eagles. Shortly thereafter, approximately 12:30 a.m., the three conversants left the party. The shootings occurred a half hour later, approximately two miles away. Rivera also told the police where they could locate Gonzalez, Perez and defendant. After reviewing the case report which included Dale Woods’ statement and obtaining photographs of the suspects from police files, Investigators Konior and Siwek drove to the location given by Rivera and, shortly thereafter, arrested the three suspects.
 

 In reviewing the foregoing facts, we are cognizant of the well-established principle that only the probability of criminal activity, and not proof beyond a reasonable doubt, is the standard for assessing probable cause. (Spinelli v. United States (1969), 393 U.S. 410, 419, 21 L. Ed. 2d 637, 645, 89 S. Ct. 584, 590, citing Beck v. Ohio (1964), 379 U.S. 89, 13 L. Ed. 2d 142, 85 S. Ct. 223.) Thus, the question is one of probabilities, not certainties. Accordingly, we conclude that the totality of the circumstances leading to defendant’s arrest were sufficient to indicate that, more probably than not, he had committed the shootings. (People v. Exline (1983), 98 Ill. 2d 150.) Therefore, we find that the trial court properly denied defendant’s motion to quash arrest.
 

 Our determination that defendant’s arrest was legal obviates the need to discuss defendant’s correlative contention that the trial court erred in denying his motion to suppress his confession on the ground that it was a direct result of the illegal arrest.
 

 We next address defendant’s contention that the prosecution denied defendant a fair trial when it: (1) repeatedly violated a motion in limine which prohibited the State from dwelling on defendant’s gang affiliations; (2) flaunted an inflammatory photograph to the jury in contradiction to the court’s ruling that the photograph should not go to the jury; - and (3) made highly improper, prejudicial comments during closing argument.
 

 First, a review of the motion in limine regarding gang affiliation reveals that the court ruled:
 

 “There can be no indeterminate evidence of gang affiliation. If it came out in examinations or in statements like anything else, it is admissible. * * *
 

 But to set it up or dwell upon it as the real structure of the case, the motion is granted to that extent.”
 

 Further, the court ruled that comments regarding gang membership made during the opening statement were permissible to the extent that those comments would be supported by the evidence.
 

 Defendant contends that the following comments violated the foregoing ruling:
 

 Opening statement
 

 “And as [defendant’s] statement will show and as the evidence will show, there was a gang involved. A vicious street gang. And that members of which were at the party with George Cruz had been themselves, attacked by other rival gangs called the Latin Eagles. And as the defendant stated in his statement and as the evidence will show, the Latin Eagles victimized people in the Wrigley Field area of Chicago. It was their plan to take a car and a gun. To drive to that area of the city, Wrigley Field. To find members of the Latin Eagles — [and] *** to shoot them down in cold blood.”
 

 Closing argument:
 

 “[The witnesses] *** showed you how Chicago street gangs operate. They operate in pairs and in packs. *** They operate in darkened alleys and from moving cars. They operate on the streets of Chicago, city streets which they call their turf.”
 

 Rebuttal closing argument:
 

 “And remember what [Dawn Ellis] did the next day when she got back from the hospital. Think about if she would have done this otherwise. She packed her bags and she got out of there because she knew that the man she saw saw her. And she didn’t want to see him again. And she knew what he and his kind [of] gangs are capable of doing to witnesses. * * *
 

 Tell [defendant] we’re not going to allow squadrons of gangs of armed criminals like him and him to use the street as staying grounds for their gang-related and violent missions.”
 

 Contrary to defendant’s position, we do not find that the foregoing comments violated the court’s ruling in limine. While the comments may have been emotionally charged, they were within the parameters of proper opening statement and closing argument. It is well established that an opening statement in criminal cases is an outline of facts which the prosecution in good faith expects to prove. (People v. Roberts (1981), 100 Ill. App. 3d 469, 476, 426 N.E.2d 1104.) The opening statement comments objected to by defendant were a synopsis of defendant’s admission which was later introduced into evidence. Accordingly, the comments neither violated the ruling in limine nor abused established common law guidelines.
 

 An equally well-known legal axiom is that great latitude is allowed prosecution counsel in closing argument and each case must be decided on its own facts. (People v. Belton (1982), 105 Ill. App. 3d 10, 16, 433 N.E.2d 1119.) For example, the State has a right to dwell on evil results of crime, to urge a fearless administration of the law, and to comment on the conduct of the accused. (People v. Bruce (1951), 344 Ill. App. 114, 122, 100 N.E.2d 350.) Moreover, the substance and style of closing argument is within the discretion of the trial court, and its findings will not be disturbed absent extreme error. (People v. Maldonado (1981), 101 Ill. App. 3d 948, 951, 428 N.E.2d 1087.) Based upon the aforementioned legal axioms and our conclusion that the State’s comments did not violate the mandates of the trial court’s ruling in limine, we find that the State’s comments regarding gang affiliation were proper and did not prejudice defendant’s rights to a fair trial.
 

 Next, defendant assigns as error the State’s display to the jury of an inflammatory photograph of the deceased’s face taken immediately after the shooting. Initially, during the jury instructions conference, the court ruled that the photograph was admissible as evidence, but would not go to the jury because it was “very gory and distorted.” Subsequently, during rebuttal closing argument, the State briefly showed the photograph to the jury. Although defendant did not object to the display at trial, defendant later moved for a mistrial on the ground that the State had violated the court’s earlier ruling regarding the photograph. The court denied the motion, and, in doing so, seemingly altered its original rationale for withholding the photo from the jury, stating that “the picture could have gone to the jury. The court just felt in the totality of the evidence it was unnecessary * * * If
 

 Because the photograph was not made a part of the record and there is no specific evidence in the record as to the size of the photograph, how it was displayed, and at what distance, we must defer to the judgment of the trial court (see People v. Butler (1976), 41 Ill. App. 3d 750, 753, 354 N.E.2d 568) and concur that the State’s display of the photograph did not violate the intent of the trial court’s initial ruling and, therefore, did not prejudice defendant’s right to a fair trial. See People v. Eckles (1980), 83 Ill. App. 3d 292, 301, 404 N.E.2d 358.
 

 Finally, defendant assigns as error the State’s additional comments made during closing argument wherein the State allegedly: (1) analogized a criminal case to a civil case; (2) attempted to shift the burden of proof; (3) commented on the rights of the victims and of the deceased’s mother; and (4) criticized defense counsel’s trial tactics as well as those of his law partner. As stated previously, substantial latitude is accorded to attorneys in their closing arguments. (People v. Belton (1982), 105 Ill. App. 3d 10, 16, 433 N.E.2d 1119.) Even improper remarks may be considered harmless error if there is overwhelming evidence of defendant’s guilt, and a new trial will not be granted unless the remarks are so prejudicial as to materially contribute to defendant’s conviction. {People v. Lloyd (1981), 93 Ill. App. 3d 1018, 1025, 418 N.E.2d 131.) In the present case, while we do not condone the State’s remarks, in light of the overwhelming evidence of defendant’s guilt, neither do we find that the remarks constituted a material factor in his conviction. Accordingly, we conclude that defendant was not denied a fair trial. For the reasons stated, we affirm the judgment of the circuit court of Cook County.
 

 Affirmed.
 

 SULLIVAN and MEJDA, JJ., concur.