THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HERMAN MITCHELL, Defendant-Appellant.

First District (5th Division)   No. 82—2663

Opinion filed April 27, 1984.

James J. Doherty, Public Defender, of Chicago (Suzanne M. Xinos, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Jane E. Liechty, and Neil J. Linehan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

Following a jury trial, defendant was convicted of murder and sentenced to a term of 25 years. On appeal, he contends that (1) the trial court erred in denying his motions to quash his arrest and suppress his statements; and (2) he was denied a fair trial (a) by improper prosecutorial comments in rebuttal argument and (b) by the State's knowing use of perjured testimony.

The charges arose from the fatal shooting of Gregory Campbell (Campbell) on August 15, 1981, and as there is no contention that guilt was not established, we will set forth only the testimony relevant to the issues presented.

At a pretrial hearing on the motion to quash his arrest, defendant testified that he and a friend were standing on a corner at about 9:30

a.m. on August 24, 1981,[1] when Officer Butler approached with another officer and said, "The big boys are looking for you." He was then handcuffed and taken to a police station where he remained for about 45 minutes, after which he was picked up by other officers and taken to Area 6 headquarters. None of the officers produced an arrest warrant, nor did they tell him that he was under arrest for murder.

Officer Jordan testified that while on routine patrol with Officer Butler on August 25, 1981, at about 10 a.m., he saw defendant, whom they had arrested before, standing in front of a store with two other persons. Having been informed a few days earlier by other officers that defendant was wanted in connection with an August 15 murder, he and Butler placed defendant under arrest, took him to their station, advised him of his constitutional rights, and contacted Area 6 officers.

Investigator Elmore testified that on August 18, 1981, at about 10:30 p.m., he and his partner interviewed Stewart Parker (Parker) concerning the murder of Gregory Campbell. Parker told them that he was at the victim's apartment when a friend named B. K. Harrison arrived and told them that three men were after him. Shortly after Harrison left, defendant, "Mookie" Tate, and a third man came there looking for him. Defendant threatened Campbell with a gun and, when Campbell denied knowing Harrison's whereabouts, Tate took the gun from defendant and shot Campbell numerous times. Defendant then held him (Parker) while Tate went to find a weapon with which to kill him, but he broke loose from defendant's grasp, ran to the bedroom, and jumped out of the second-floor window. Elmore stated that he and his partner first spoke to Parker at the YMCA work release center, and that he voluntarily agreed to accompany them to the police station for further questioning. He stated that no threats or promises were made to Parker prior to the statement he gave, and that there was no reason to do so since they didn't believe he was involved in the crime.

Lester Finkle, a former law clerk at the public defender's office, testified that on February 24, 1982, he and defense counsel interviewed Parker at the Cook County jail, where he gave a written statement which Finkle read into the record. In it, Parker stated that although he had been at Campbell's apartment in the early afternoon

---

[1]There was considerable conflict concerning the date of defendant's arrest. He consistently maintained that the police apprehended him on August 24, 1981, while police officers testified that the correct date was August 25, 1981. Defense counsel ultimately deferred to the officers' recollection.

of August 15, 1981, he was not there when Campbell was murdered; that when the police picked him up at the work release center, they handcuffed him, threatened him, and then promised to get him out of the center if he cooperated with them; that he was treated very poorly throughout the five hours he spent in police custody against his will; and that it was actually B. K. Harrison who made the statement to the police attributed to him. Finkle also testified that Parker read the statement and voluntarily signed it. In denying the motion to quash the arrest, the trial court found that there was sufficient basis to arrest defendant on August 24, 1981.

The court then held a second pretrial hearing on defendant's separate motion to suppress his written statement given to an assistant State's Attorney. Defendant asserted that the statement was involuntarily given because the police officers procured it by inducements, with numerous promises throughout several hours of intermittent interrogation that if he cooperated in their investigation of the unrelated homicide of "Mookie" Tate, he would not be charged with Campbell's murder and his parole warrant would be quashed. Officers Keane and Porter, the interrogating officers, testified that no such promises were made. The trial court denied the motion, finding that the statement was voluntarily given.

At trial, Detective Keane testified that at about 5 p.m. on August 25, 1981, after being advised of his constitutional rights, defendant voluntarily told him that he, "Mookie" Tate, and "Sandman" Dillon were members of the Stones street gang; that on August 15, 1981, they went to Campbell's apartment to look for Harrison, another member of the gang who had been ordered by Dillon to get some guns to use in robbing neighborhood drug dealers; that they saw Parker standing in front of the building and asked him if he had seen Harrison, and when Parker told him that he had not, he hit Parker and ordered him at gunpoint to the second-floor apartment, which he knew Harrison often visited; that once inside, he put a gun to Campbell's head and again asked him where Harrison was, and when Campbell denied knowing his whereabouts, he and his companions left. On the way out, Tate grabbed the gun from him, saying that he thought he heard a noise inside the apartment, and they reentered. After searching the apartment, he told Tate that Harrison was not there, and Tate then shot Campbell several times. He (defendant) then grabbed Parker and held him, while Tate—having expended all the bullets in the gun—went to look for a knife with which to kill Parker. Parker broke loose and jumped out the bedroom window, whereupon he, Tate, and Dillon left the apartment and went to a tavern where he

obtained a sawed-off shotgun they planned to use to kill another gang member known as "Cowboy."

Assistant State's Attorney Mahon testified that he advised defendant of his *Miranda* rights at about 10 p.m. on August 25, and that after signing a written waiver thereof, defendant gave a court reporter a statement which was essentially a recapitulation of the statement that Detective Keane testified defendant made to him.

Stewart Parker's testimony was substantially the same as the statement he gave to Officer Elmore, except that he said defendant (not Tate) was holding the gun just prior to the shooting. Parker admitted to convictions for burglary, theft, and unlawful use of weapons and that he was then serving a sentence for a misdemeanor offense, which was in violation of his parole. He stated, however, that the only promise made to him in return for his testimony was that he would be placed "somewhere where no one would harm me." He acknowledged making the statement to defense counsel and Lester Finkle, but he explained that he said those things because he was afraid that if he did not, defendant—who was in another division of the prison—would seek revenge.

OPINION

██ Defendant's threshold contention is that his warrantless arrest was illegal and should have been quashed because the State failed to show that Parker was a credible informant or that his information was sufficiently reliable to establish probable cause. We disagree.

Initially, we note that probable cause for a warrantless arrest exists where there are reasonable grounds to believe that the prospective arrestee has committed a crime (*People v. Lippert* (1982), 89 Ill. 2d 171, 432 N.E.2d 605, *cert. denied* (1982), 459 U.S. 841, 74 L. Ed. 2d 85, 103 S. Ct. 92), and the standards applicable to a police officer's assessment of probable cause based on an informant's tip are at least as stringent as those required for the issuance of a warrant by a magistrate (*People v. Johnson* (1983), 94 Ill. 2d 148, 445 N.E.2d 777).

In his brief, defendant urged that the applicable standard is the two-pronged "reliability" and "basis of knowledge" test set forth in *Aguilar v. Texas* (1964), 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509, and *Spinelli v. United States* (1969), 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584. A determination of probable cause thereunder required facts indicating that the informant was credible and his information reliable, and a showing of some of the underlying circumstances from which the informant concluded that the suspect had committed a crime. However, defendant acknowledged during oral ar-

guments before us that this somewhat rigid test has been abandoned by the United States Supreme Court in favor of the "totality of the circumstances" approach adopted in *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317. In upholding the validity of a search warrant issued on the basis of a partially corroborated informant's tip, the Supreme Court first observed that probable cause is a practical, nontechnical concept which does not lend itself to a stringent set of neat legal rules but, rather, turns on the common sense assessment of probabilities in particular factual contexts. It then stated that while an informant's credibility, reliability, and basis of knowledge are relevant considerations in determining the value of his information, they should not be understood as separate and independent requisites to be rigidly exacted in every case, but should instead be viewed as closely intertwined factors which serve as guidelines in resolving the common sense, practical question—whether probable cause exists.

The *Gates* court reasoned that a deficiency in one area may be compensated for in determining the overall reliability of the informant's report, by a strong showing as to the other or by some other *indicia* of reliability, thus permitting a balancing of the relative weights of all the various *indicia* of reliability attending an informant's tip. As an example of this analysis, the court stated that even where there is some doubt as to the informant's motives, his explicit and detailed description of the crime, along with a statement that he was an eyewitness thereto, entitles his tip to greater weight than it might otherwise receive. Thus, under the standard enunciated in *Gates*, a warrantless arrest based on the information supplied by an informant is justified if, given all of the facts and circumstances, there is a fair probability that the prospective arrestee has committed a crime, and the duty of the reviewing court is simply to ensure that there was a substantial basis for this conclusion. (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317.) Furthermore, even prior to *Gates*, Illinois courts have held that where the trial court has conducted an evidentiary hearing on a motion to quash an arrest and suppress evidence, its finding of probable cause will not be disturbed on appeal unless manifestly erroneous (*People v. Sakalas* (1980), 85 Ill. App. 3d 59, 405 N.E.2d 1121), and when examining a ruling on such a motion, the reviewing court may consider any evidence adduced during trial which assists in establishing the legality of the arrest (*People v. Caballero* (1983), 102 Ill. 2d 23; *People v. Summers* (1981), 100 Ill. App. 3d 170, 426 N.E.2d 937).

Turning then to the instant case, we initially note that Officer

Elmore testified at the hearing that he had been assigned to investigate Campbell's murder; that although he and his partner initiated the contact with Parker after locating him at the work release center, Parker voluntarily agreed to accompany them to the police station for further questioning; that during the interview, Parker asserted that in addition to being an eyewitness to the crime, he was a near-second victim thereof; that Parker provided a detailed account of the shooting, naming defendant as one of the participants and describing his role therein; that Parker was never a suspect in this case, nor was he ever threatened or placed under arrest; and that no promises were made in return for his testimony. However, in rebuttal, defense counsel introduced a statement taken by him and signed by Parker during an interview at the Cook County jail six months after defendant's arrest wherein Parker not only made the aforementioned allegations concerning the involuntariness of his detention and the threats and promises made, but also summarily denied having any knowledge regarding Campbell's murder or giving information thereabout to the police.

It is the function of the trial court to resolve conflicts in the testimony and statements presented at a pretrial hearing on a motion to quash (*People v. Clay* (1973), 55 Ill. 2d 501, 304 N.E.2d 280), and it is apparent that the trial court here determined that the testimony of Officer Elmore had greater credence than did the statement by Parker made six months after the incident to an attorney he knew to be representing defendant. We do not find that determination manifestly erroneous; indeed, it was supported by Parker's trial testimony that he voluntarily cooperated with the police; that the only promise made by them was that he would be placed in protective custody; and that the existence of the contrary statement given to defense counsel was explained by his testimony that he feared reprisal from defendant.

Nevertheless, defendant argues that because of Parker's "protracted" criminal record and his status as a parolee as well as a suspect in this case, his motive for cooperating with police and consequently the information he gave them were necessarily suspect. He likens Parker to a professional informant; however, it is well settled in Illinois that absent indications that the person who supplied the information is a paid police informer, there is a presumption that he is an ordinary citizen (*People v. Duncan* (1982), 104 Ill. App. 3d 701, 432 N.E.2d 1328) whose information has inherent reliability (*People v. Martin* (1977), 46 Ill. App. 3d 943, 361 N.E.2d 595) and thus is not subject to the same scrutiny as that received from an informer from

the criminal milieu, who is paid for his information (*People v. Hester* (1968), 39 Ill. 2d 489, 237 N.E.2d 466). This is especially true where the person making the report was a victim or eyewitness to the crime. (*Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317; *People v. Garcia* (1981), 94 Ill. App. 3d 940, 419 N.E.2d 542.) Here, while it is not our intention to minimize the seriousness of Parker's convictions, neither do we believe that they automatically classify him as a person devoid of credibility or as a professional informer, and defendant has presented no contrary evidence in those regards. We therefore agree with the trial court's characterization of Parker as a "citizen" from whom the police obtained information concerning a crime being investigated.

Neither do we find any record support for defendant's allegation that Parker was a suspect in the instant offense; to the contrary, Investigator Elmore expressly denied that Parker was thought to have been involved therein. Moreover, in the recent case of *People v. Cruz* (1983), 119 Ill. App. 3d 868, 457 N.E.2d 1281, we held that under the "totality of circumstances" analysis of *Gates*, the fact that the informant is also a suspect in the crime and may even have been taken into custody therefor, is not a determinative *indicium* of his unreliability, but is merely one factor, the import of which is to be weighed and balanced within the totality of circumstances. Thus, assuming *arguendo* that Parker's motives for cooperating with police were questionable, it is our opinion that his explicit and detailed eyewitness account of the shooting adequately compensated for any alleged deficiency in his overall reliability.

Finally, while it is our view that the trial court's denial of defendant's motion to quash is supported by both pretrial and trial testimony, we additionally note that nowhere in the record did the court say, as defendant asserts, that Parker's reliability was irrelevant to a determination of probable cause, nor was there any indication therein that the court discounted any evidence which might have cast doubts upon the trustworthiness of his information. Therefore, we find no merit in defendant's contention that neither Parker nor the information he gave the police was sufficiently credible to establish probable cause for his arrest.

Given this finding and noting that defendant does not argue that his confession was involuntarily given, it follows that his second contention—that the confession should have been suppressed because it was the fruit of the alleged illegal arrest—must be rejected as meritless.

■ Defendant next contends that certain comments by the prose-

cutor in rebuttal argument denied him a fair trial. He argues that the prosecutor misstated the burden of proof and improperly referred to excluded evidence and to crimes with which he was not charged.

Although a prosecutor is permitted wide latitude in closing argument (*People v. Belton* (1982), 105 Ill. App. 3d 10, 433 N.E.2d 1119), his comments must be based on evidence admitted at trial or on reasonable inferences therefrom (*People v. Wallace* (1981), 100 Ill. App. 3d 424, 426 N.E.2d 1017). Furthermore, comments which are designed to shift the burden of proof (*People v. Ayala* (1981), 96 Ill. App. 3d 880, 422 N.E.2d 127) or reduce it to a *pro forma* detail are improper (*People v. Frazier* (1982), 107 Ill. App. 3d 1096, 438 N.E.2d 623). However, they do not necessitate reversal unless they result in substantial prejudice to defendant (*People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200); *i.e.*, that they were such a material factor in defendant's conviction that the jury would likely have reached a contrary verdict had they not been made (*People v. Witted* (1979), 79 Ill. App. 3d 156, 398 N.E.2d 68). Moreover, defendant's failure to make a timely objection to the comments at trial or to specify them in his post-trial motion generally constitutes a waiver of any improprieties in closing argument. *People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739.

Defendant first argues that the prosecutor misstated the law regarding the State's burden of proof and thus undermined his presumption of innocence. At the outset of rebuttal argument, the prosecutor stated:

"I am the final attorney to have the opportunity to speak to you and the reason why the State has the opportunity to speak to you last is we do have the burden of proof. This is no different in this case than in any other case tried in this building or in this county or in the state or in the country."

Because no objection was made to this remark at trial and since it was not alleged as error in defendant's post-trial motion, it must be deemed waived for purposes of review. Moreover, although defendant cites numerous cases wherein similar remarks have been held to be improper, we note that in each of these cases reversal was based either on other grounds or on the cumulative effect of numerous instances of prosecutorial misconduct resulting in substantial prejudice to the accused. (See *People v. Scaggs* (1982), 111 Ill. App. 3d 633, 444 N.E.2d 674; *People v. Frazier* (1982), 107 Ill. App. 3d 1096, 438 N.E.2d 623; *People v. Johnson* (1981), 102 Ill. App. 3d 122, 429 N.E.2d 905.) Here, it is our view that when read within the context of the closing and rebuttal arguments in their entirety, the challenged

comment was not so prejudicial as to have been a material factor in defendant's conviction. See *People v. Young* (1983), 118 Ill. App. 3d 803, 455 N.E.2d 845.

■ Defendant next argues that the prosecutor violated the trial court's ruling on a motion *in limine* by twice commenting on excluded evidence. In closing argument, the prosecutor stated:

> "The defendant, at that point, after being involved in the killing of one man, he goes to the tavern, goes under the El tracks of the tavern and gets his shotgun * * *."

Defendant posits that by this statement, the prosecutor violated the trial court's ruling to exclude evidence concerning the shotgun used to kill "Mookie" Tate, and that the court therefore erred in overruling his objection and denying his motion for a mistrial on the basis of this comment. We disagree. At trial, Detective Keane testified that according to defendant, after leaving the scene of the shooting, he (defendant), Tate, and Dillon went to a tavern to retrieve a shotgun with which to shoot a gang member known as "Cowboy." No objection was made at the time this testimony was given, although shortly thereafter defense counsel did object to the prosecutor's inquiry concerning the whereabouts of "Mookie" Tate, and in a sidebar conference thereon, the court granted defense counsel's motion to bar the introduction of any evidence regarding the fact that Tate had been murdered, allowing the State to establish only that Tate was dead.

In response to defendant's second motion, to exclude evidence of other crimes, the court stated: "That will be denied because I heard no evidence of other crimes." Thus, while it is clear that evidence concerning Tate's murder was excluded, we see nothing in the court's ruling barring any reference to the shotgun, nor have we found anything in the record establishing a connection between the shotgun and Tate's murder from which we could even infer that such an exclusion was intended. To the contrary, in arguments on the motion, defense counsel acknowledged that the shotgun was unrelated to Tate's death. Thus, it is our view that the challenged remark, although of unexplained relevance, was not an inaccurate recount of evidence admitted at trial.

Defendant further argues that the prosecutor's follow-up comment, that defendant "became involved in the shooting of another man named 'Cowboy' " similarly violated the court's ruling on the motion *in limine* and deprived him of a fair trial. Although this comment was not a wholly accurate representation of Keane's testimony, inasmuch as Keane did not testify that defendant admitted being involved in the shooting of "Cowboy" but, rather, that he retrieved the shot-

gun with the intent to so use it, we note once again that defendant failed to demonstrate that there was a relationship between the plan to shoot "Cowboy" and the murder of "Mookie" Tate which would bring the former within the purview of the court's ruling to exclude evidence concerning the circumstances of Tate's death. Furthermore, in our judgment, any potential prejudice which might have resulted from this remark was obviated by the trial court's reminder when overruling defendant's objection to the comment, that the jury was not bound to accept the prosecutor's version of events testified to at trial. Finally, in view of the overwhelming evidence of guilt, including defendant's own inculpatory statement, we cannot see how this remark could have contributed to the guilty verdict.

■ Defendant's final allegation of impropriety in closing statements concerns the prosecutor's admonition to the jury that "society will not tolerate someone who will hide behind the actions of another when they are actively involved, for instance, dope dealers that use juveniles to deliver ***." Defendant maintains that the reference to "dope dealers" was meant to imply that he was involved in illegal trafficking of drugs—a crime with which he was not charged. While it is conceivable that this unfinished remark was intended to exemplify the rationale underlying the doctrine of accountability on which defendant was charged in this case, we need not engage in conjecture on this point since the trial court sustained defense counsel's objection and ordered the comment to be stricken, thus curing any error which might otherwise have occurred.

In summary, we do not believe that the prosecutor's remarks, either individually or in the aggregate, were so prejudicial as to have been a material factor in defendant's conviction or to have denied him a fair trial.

■ Lastly, defendant contends that he was denied due process by the State's knowing use of the perjured testimony of its principal witness. Specifically, defendant posits that Parker committed perjury when he testified that no promise of lenience for violation of parole had been given in return for his testimony. Although defendant raised this issue in his post-trial motion, it is clear that there is no direct evidence that such a promise was made, and in fact, the only testimony in that record, from Parker and other State's witnesses, was that there were no promises of leniency. Moreover, in support of his position here, defendant asserts only matter not in the record; namely, that Parker was released from jail five days after the conclusion of the trial and served only 210 days of his 300-day sentence. It is well settled that an allegation that the State obtained a conviction by

knowing use of perjured testimony is an issue of constitutional magnitude (*People v. Graham* (1977), 48 Ill. App. 3d 689, 363 N.E.2d 124); however, such claims generally will not be considered by a reviewing court where the issue was not presented to and ruled upon by the trial court and, as here, the facts alleged in support of the claim do not appear in the record (*People v. Macias* (1968), 39 Ill. 2d 208, 234 N.E.2d 783). Rather, section 122—1 of the Code of Criminal Procedure of 1963 (the Post-Conviction Hearing Act) (Ill. Rev. Stat. 1981, ch. 38, par. 122—1) provides the appropriate procedure through which defendants may assert such a charge. That section provides:

"Any person imprisoned in the penitentiary who asserts that in the proceedings which resulted in his conviction there was a substantial denial of his rights under the Constitution of the United States or of the State of Illinois or both may institute a proceeding under this Article. The proceeding shall be commenced by filing with the clerk of the court in which the conviction took place a petition (together with a copy thereof) verified by affidavit."

The function of the pleadings required by this section is to determine whether defendant is entitled to an evidentiary hearing and to afford the State the opportunity to respond (*People v. Airmers* (1966), 34 Ill. 2d 222, 215 N.E.2d 225), and in order to receive such a hearing, the defendant must make a substantial showing, by verified affidavit specifying with reasonable certainty the evidence which supports his allegation, that his constitutional rights were violated (*People v. Ashley* (1966), 34 Ill. 2d 402, 216 N.E.2d 126).

It appears that no such petition was filed and, on the basis of the record before us, we find no basis to support defendant's contention that he was denied due process because of perjured testimony.

For the reasons stated, the judgment is affirmed.

Affirmed.

MEJDA, P.J., and WILSON, J., concur.