THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER LEKAS *et al.*, Defendants-Appellants.

First District (2nd Division) Nos. 84—0873, 84—0970 cons.

Opinion filed March 17, 1987.—Rehearing denied May 19, 1987.

James J. Doherty, Public Defender, of Chicago (James H. Reddy, Assistant Public Defender, of counsel), for appellant Phillip Lekas.

Steven Clark and Cheryl Berdelle, both of State Appellate Defender's Office, of Chicago, for appellant Christopher Lekas.

Richard M. Daley, State's Attorney, of Chicago (Joan S. Cherry, Peter D. Fischer, and Larry Axelrood, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SCARIANO delivered the opinion of the court:

Defendants, Phillip and Christopher Lekas, filed this consolidated

appeal from their convictions, at a joint trial, of murder, armed robbery, and aggravated arson. Phillip received concurrent sentences of 45 years for murder and 30 years each for armed robbery and aggravated arson. Christopher was given concurrent sentences of 70 years for murder and 30 years each for aggravated arson and armed robbery. We reverse Phillip's conviction for aggravated arson, and affirm his convictions for murder and armed robbery. We reverse Christopher's convictions on all counts and remand his cause for a new trial.

Helen Samp was slain between 11 a.m. and 2 p.m. on August 30, 1982, at the home of her son-in-law, Leo Russell, in the city of Chicago. A fire was set at the house, and approximately $44,000 was taken from Leo's coin collection. At the time of the offenses, Leo was bowling with George Lekas. The police questioned George Lekas at 5 p.m. the next day at the police station, and after a polygraph exam, George admitted that he had received a telephone call at the bowling alley from his brother Phillip, but said that it related to a marijuana contact. At the end of the interview, about 10:30 p.m., George stated that he wanted to tell the police "one more thing." He said that his brothers Christopher and Phillip knew of his bowling date with Russell, that they were in need of money, were constant drug abusers, and had been to Russell's house before. George added that he had heard his two brothers talk about stealing Russell's coin collection. The interrogating officer Detective Cegielski went off duty at about midnight and told officers on the next shift to arrest Christopher and Phillip.

Between 3 and 5 a.m. on September 1, 1982, police officers went to the home of Raymond Lekas, awakened him, and asked to see his sons. The police did not have arrest warrants, nor had they taken their information to any judge to seek a warrant. Mr. Lekas roused Christopher out of bed. He later testified that his son was "high on something," and that Christopher was unable to walk by himself or hold himself up. Christopher's wife testified that she saw her husband inject a drug known as "PCP" into his arm at about 2:30 in the morning and then fall back to sleep. When Christopher arrived at the front of the house he had to lean against the wall. There was conflicting testimony as to whether the police opened the screen door and pulled Christopher outside, or whether he came onto the porch on his own. Minutes later, Phillip stepped out on the porch and both were then arrested.

Phillip and Christopher were brought to Area Three police headquarters and placed in separate rooms; George also remained in police

custody for the rest of the night, and all three were questioned about the Samp homicide at various times on the following day, September 1. That morning George asked to see Detective Cegielski, to whom he admitted that his brothers had told him that they had "ripped off" Leo Russell and killed Mrs. Samp. According to George, Christopher had explained how he and Phillip had committed the crimes. George also told the police that he had seen proceeds from the crime at the Clayton Motel. Detective Cegielski testified that shortly after 9 a.m., he spoke separately, for no more than 15 minutes, with Christopher and Phillip after giving them *Miranda* warnings. At around noon, the detective went to the Clayton Motel to substantiate what George had told him. A desk clerk identified Phillip and Christopher as having recently been to the motel with George. At 1 p.m., Cegielski returned to the police station, where he again advised Christopher of his rights, and Christopher indicated that he understood. According to Cegielski it was during this conversation that Christopher first implicated himself and his brothers in the crime. At 7 in the evening, following his arrest, Christopher led police to a secluded area on a dirt road near 75th Street and Central Avenue in Chicago and showed them part of the stolen coin collection.

Earlier, at 5:14 p.m., Phillip had given a court-reported statement, which was subsequently introduced at trial, and in which Phillip stated that he knew of Russell's coin collection and had gone to Russell's house with Christopher. Mrs. Samp, the murder victim, invited them in. Once inside, Christopher grabbed her and knocked her to the floor. She screamed, and Phillip got a pillow, which Christopher used to keep her quiet. The dog was barking, but Phillip told Christopher to leave it alone; yet, as he headed downstairs, he saw Christopher twist the dog's neck. Phillip put on surgical gloves and started looking for money in a basement desk. When he found it, he loaded it into a briefcase and sports bag. Christopher came down and helped him for a while and then went back upstairs. Phillip told the police that he heard shuffling and that Christopher returned to tell his brother that he had bound and gagged Mrs. Samp. Phillip then carried one of the bags out to the car and returned to help his brother with the other. Phillip noticed that his glove had ripped, so he lighted a fire in the basement, apparently to destroy fingerprints. Phillip said that he and his brother walked out of the house together and that he got into the driver's seat. The transcript of Phillip's statement shows that he was then asked:

"Q. What did Chris tell you he did with the lady?"
And Phillip answered:

"A. First, he told me to go ahead, then turn right. We were riding down the street and he told me he shot the lady in the head, in the temple."

At 9:06 p.m., eight hours after first implicating himself, and after having taken police to a hiding place for the stolen money, Christopher made a court-reported statement which was also later introduced into evidence at trial. Christopher said that he was with Phillip when the latter phoned their brother George at the bowling alley, who said that Russell had just arrived. When the two reached Russell's home, an old lady unexpectedly answered the door. Phillip told her that he had a briefcase to give to Russell, and Christopher asked to use the bathroom. While Christopher was getting a drink of water, Phillip jumped her and knocked her down. Mrs. Samp screamed, and Phillip put a pillow over her face while Christopher tied her hands, then they both tied her legs. Christopher killed the dog, while Phillip went downstairs. Christopher eventually followed, and Phillip handed him some surgical gloves and a gun, which Christopher concluded must have belonged to Russell. They put the money into the briefcase and sports bag, after which Phillip took the money outside and Christopher went upstairs to "see how the old lady was doing." Phillip came back, and Christopher brought out another "big heavy bag" of money from the basement. However, before he left with the bag, Christopher said, he went to where Mrs. Samp was lying on the floor. The transcript of Christopher's statement reveals the following exchange:

"Q. Did you have a gun, at the time?

A. Yes, I had it in my hand.

Q. What did you do with the gun at that time?

A. I looked at the gun. I said, what am I doing here, and I pointed to my head, and I was going to shoot myself. First, I thought it was a toy. And then I just pointed it down and it went off. I was fucked up and it went off.

Q. Did you shoot the old lady, then?

A. Apparently it went in her head, yes.

Q. Did you see her start bleeding then?

A. No, I didn't see any blood, sir.

Q. Did you leave the house then?

A. I was crying already. I never hurt nobody in my life before."

Both defendants made motions to suppress their statements on the dual grounds that their arrests were illegal and that their statements had been involuntary. At the hearing on the motions to quash

defendants' arrests and suppress their statements, the trial judge noted that the testimony conflicted as to whether the police actually came inside the Lekas home to apprehend Christopher. The judge added that although Raymond Lekas testified that he did not give the police permission to enter his home, he had not denied them access or refused to call his sons to the door. The judge concluded that if the police had entered, they had gone no more than 5 feet, and had done so simply to assist Christopher in walking out. Moreover, the judge ruled that exigent circumstances justified the warrantless arrest because of the need to prevent flight and disposal of the weapon and the proceeds of the crime. The judge observed that the crime charged was murder, the gun used had not yet been found, and one of the offenders, George, was in police custody at the time of defendants' arrest.

As to the involuntariness claims, both defendants testified at pretrial hearings on their motions that they were physically abused. Christopher's wife testified that when she visited her husband in the Cook County jail, three days after his arrest, she observed a number of bruises on his chest. Christopher also testified that he had injected a quarter gram of "PCP" into his arm an hour before he was arrested. Defendant's expert witness, Dr. Porter, testified that the drug produces profound disorientation in those amounts, which could last for several days in a person of Christopher's size, and that Christopher would have been susceptible to suggestion because of stress. On cross-examination, Dr. Porter conceded that Christopher's extended use of "PCP" could have produced a tolerance for the drug. He also stated that, other than at a few points, Christopher's statement appeared to be normal.

Detective Cegielski and his partner, Detective Foley, both denied making threats or promises or physically abusing the prisoners. They stated that Christopher did not show any signs of intoxication. Assistant State's Attorney Thomas Roche testified that before Christopher gave his reported statement on September 1, 1982, he displayed track marks on his arms and talked about the drugs he had taken prior to his arrest. Mora Hansen, a medical technician who did intake screening at the jail, filled out a history and physical examination report on Christopher on September 3, 1982. She had noted a scar on his left arm, but had not recorded any bruises.

After hearing evidence at the suppression hearing, the judge ruled that Christopher's will had not been overborne despite his drug use many hours earlier. The judge noted that before his confession, Christopher had been capable of denying any involvement in the

crime, had given an alibi, and that Christopher and Phillip both indicated in their statements that no promises or threats had been made in return. The judge added that even those witnesses who had reported seeing marks and bruises on defendants' bodies differed substantially as to the size thereof. The judge concluded that both defendants, after being advised of their rights, had knowingly and intelligently waived their self-incrimination privilege, and had given their statements to the police freely and voluntarily.

Before trial, counsel for both defendants made motions to sever. Counsel for Christopher indicated that Phillip's attorney had told him that Phillip planned to testify to statements made by Christopher shortly after the crime, and counsel argued that Christopher would have to defend against charges from both his brother and the prosecution. The court denied Christopher's motion on the grounds that he would be presenting an intoxication defense, which would not be inconsistent with Phillip's evidence. The court denied a similar motion by Phillip, but stated that should Phillip take the stand he would sever their cases and proceed with the same jury against Christopher only.

In his opening statement, counsel for Phillip told the jury that his client could not be held responsible for the acts of his "drug-crazed" brother. Christopher's counsel promptly made a motion for a mistrial and severance, stating that Phillip was shifting the blame to Christopher, and contradicting Christopher's defense that he was not present during the crime. The court denied the motion.

After the State had presented its case, and published the out-of-court statements of both defendants, Phillip testified, and his testimony differed substantially from his prior statement to the police. He testified that on the morning of August 30, 1982, he followed his two brothers to the bowling alley, where Christopher dropped off George. After running a few errands, he and Christopher "got high" on "PCP" and marijuana. Phillip later phoned George from a pay phone, and he and Christopher then drove to Russell's home. Phillip testified that Christopher approached the house with a briefcase while he waited in the car, "mellowing out from the drugs." About 15 minutes later, Christopher waved him into the house. Phillip stated that he entered and was told to grab a suitcase and put it into the car. Phillip did so and went back to the house for another bag. He testified that he never saw Russell's mother-in-law inside the house. Phillip said that he waited in the driver's seat of the car, listening to music, until Christopher entered the passenger side and told him to drive away. Christopher was crying and said something about "the old lady, but I

couldn't understand." Phillip indicated that it sounded like "snuff" or something similar. Later, the three brothers went to a motel where Christopher gave Phillip some money, telling him to take care of his debts.

Christopher's counsel moved for a mistrial in the middle of Phillip's testimony, but the court denied the motion. Phillip further testified that police came to the Lekas home in the early morning hours of September 1. Phillip stated that after being handcuffed to the wall at the police station for many hours, he was interrogated by Detectives Cegielski and Foley. According to Phillip, when the two were alone, Foley pulled Phillip's hair, and hit him in the chest, back and groin, telling him that he had better confess. Phillip testified that he asked to call a lawyer, but the police refused to allow it, and that Foley told him that he had better give a statement to the assistant State's Attorney or he would be beaten again when the prosecutor left.

Christopher's counsel renewed his motion for a mistrial after Phillip completed his direct testimony. When the motion was denied, counsel explained that he felt compelled to cross-examine Phillip, although he felt that to do so would adversely affect his client's interests. Phillip's attorney objected because it would be "antagonistic" to Phillip's defense. The court overruled the objection, stating that no conflict was apparent.

In his cross-examination of Phillip, Christopher's attorney asked but a few questions. He first asked Phillip whether he had seen his brother with a gun on August 30, to which Phillip responded that he had not. Counsel also asked Phillip whether his brother, Christopher, had ever mistakenly recalled having done things that had in fact never happened. Phillip answered that his brother had made such mistakes. In general, Phillip's cross-examination testimony was consistent with Christopher's theory of defense; Christopher's counsel did not ask any probing questions to challenge Phillip's defense.

In his testimony, Christopher denied being at the Russell home on August 30 and denied any other participation in the crime. He testified that George had given him the money that he showed police in the prairie near 75th and Central. Christopher stated that in 12 years of taking "PCP" he had often thought that he had done something, only to learn later that it had not happened. He did not remember being arrested on September 1, 1982, but remembered waking up handcuffed to the wall. Shortly afterwards, Detectives Cegielski and Foley had consecutive interviews with him. Christopher testified that when they were alone, Foley kicked the chair out from under him and called

him a liar. He added that a few minutes later, Foley held a gun to his testicles and threatened to "make a girl" out of him if he did not say what the officer wanted to hear. After Foley left, Cegielski returned and told Christopher that it would be a good idea to cooperate with Foley. According to Christopher, Foley returned and continued to call Christopher a liar, saying that they had learned the details of the crime from his brother. Foley knocked Christopher out of his chair again, and kicked him on the backside and on the chest. Foley kept reciting the details of the crime and told Christopher that he had better repeat the same story to the assistant State's Attorney, because he would still be in Foley's custody when the assistant left.

Following the State's cross-examination of Christopher, Phillip's attorney moved for a mistrial and severance, arguing that Christopher's testimony directly impeached that of his own client. Counsel for Christopher also moved for a severance, explaining that it would be impossible for the jury to give separate consideration to the case of each defendant, given the antagonistic nature of their defenses; however, the court again denied the motions.

Phillip's counsel then cross-examined Christopher. Counsel asked him if he had entered the Russell home on August 30, with Phillip outside, and taken the coin collection. Christopher responded that he had not. Counsel also asked whether he later told Phillip that he had killed the old lady and the dog. Christopher denied it. Counsel then asked whether Phillip was lying, and Christopher responded, "I'm not lying."

Detectives Foley and Cegielski testified in rebuttal. Foley denied that he threatened or physically abused either Christopher or Phillip, and stated that he had never abused anyone. On cross-examination, counsel for Christopher attempted to bring out details of a complaint filed against Foley for alleged prior acts of physical abuse. He also sought to bring in the witness who filed the complaint to impeach Foley's testimony. The State objected on the ground that the defense was attempting to introduce a collateral matter, and the court sustained the State's objection.

The jury was sequestered overnight and, after 11 hours of deliberation, returned verdicts finding both Phillip and Christopher guilty of murder, armed robbery, and aggravated arson. After a hearing, the judge gave both defendants extended-term sentences.

## I

■■■ At the outset, Phillip and Christopher both argue that the trial court committed reversible error in denying their motions for

severance. In general, defendants jointly indicted are to be jointly tried "unless fairness to one of the defendants requires a separate trial to avoid prejudice." (*People v. Lee* (1981), 87 Ill. 2d 182, 187, 429 N.E.2d 461, 463.) In *People v. Daugherty* (1984), 102 Ill. 2d 533, 541-42, 468 N.E.2d 969, 973, our supreme court noted two common forms of prejudice. The first occurs when the one defendant has made out-of-court admissions that implicate a codefendant. Introduction of such statements into evidence, even if the jury is giving limiting instructions not to consider the statements against the codefendant, can violate the latter's sixth amendment right of confrontation. *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.

■ The second type of prejudice occurs when the defendants present defenses that are so antagonistic that it is unfair to try them together. In *People v. Daugherty* both defendants admitted out-of-court that they had been together with the victim of a stabbing on the night he was killed, but the codefendant had made one out-of-court statement indicating that the appellant had acted alone, and a second statement admitting to his own accidental stabbing of the victim, but adding that appellant had helped him to dispose of the body. (102 Ill. 2d 533, 542, 468 N.E.2d 969, 971.) Appellant's statements indicated that the codefendant had stabbed the victim to appellant's surprise. Neither defendant presented any evidence during the guilt phase of the trial, and the codefendant's statement was presented only during the death-penalty phase. Our supreme court ruled:

> "The trial court's denial of the defendant's motion for severance was an abuse of discretion. When codefendants have each made statements implicating the other by professing their own innocence, it is almost inevitable that their lines of defense at trial will become inconsistent and antagonistic and severance is necessary to forestall that result and ensure a fair trial. In such cases, the hostility between the codefendants is likely to surface whether or not they take the stand themselves." (102 Ill. 2d 533, 544, 468 N.E.2d 969, 974.)

Similarly, in *People v. Braune* (1936), 363 Ill. 551, 2 N.E.2d 839, the premier case on "antagonistic defenses," our supreme court reversed the convictions of two doctors charged with manslaughter arising from a criminal abortion. Each defendant protested his innocence and condemned the other, and each attempted to discredit his codefendant's witnesses. The supreme court commented, "[t]he trial was in many respects more of a contest between the defendants than between the People and the defendants. It produced a spectacle where the People frequently stood by and witnessed a combat in which the

defendants attempted to destroy each other." 363 Ill. 551, 557, 2 N.E.2d 839, 842.

■■ The decision denying a severance is reviewed under an "abuse of discretion" standard, based on information available to the trial judge at the time the motion is made. (*People v. Lee* (1981), 87 Ill. 2d 182, 186, 429 N.E.2d 461, 463-64.) Christopher made a sufficient and timely showing to the trial judge to convince us that the judge's refusal to grant severance was an abuse of discretion. Before trial, Christopher's counsel moved for severance explaining that he had learned that Phillip planned to testify to the statements made by Christopher shortly after the crime. Counsel argued that Christopher would have to defend against his brother's testimony as well as the prosecution's charges. Next, Christopher's counsel moved for a mistrial and a severance when Phillip's attorney, in his opening statement, said that Phillip should not be held accountable for the acts of his "drug-crazed" brother. It should have been evident to the trial judge at least by then that the defenses were antagonistic, especially when counsel explained that Christopher's defense was that he was not present during the crime, while Phillip's defense was that Christopher committed the murder.

At trial, Christopher's testimony that he was not present when the crime took place was directly contradicted by his brother's testimony. Christopher's situation is similar to that of the defendant who obtained a reversal in *People v. Murphy* (1981), 93 Ill. App. 3d 606, 417 N.E.2d 759. In that case, two defendants were tried jointly and found guilty of armed robbery. One defendant, Bell, testified that he spent the entire evening of the crime at home, while his codefendant, Murphy, testified that they both had been present at the scene of the crime. Murphy added, however, that he was away from the victim but saw Bell talking to her and that Bell later gave him her car keys. The appellate court stated: "Bell's explanation that Murphy's testimony would implicate him, thereby contradicting his alibi and that the possibility of prejudice was absolute, was sufficient to show that the defenses were antagonistic." (93 Ill. App. 3d 606, 612, 417 N.E.2d 759, 763.) See also *People v. Jones* (1980), 81 Ill. App. 3d 724, 727-28, 401 N.E.2d 1325, 1328-29 (codefendant's testimony that he and defendant were present at the scene of a theft, but that codefendant left early, was antagonistic to defendant's claim that he was not present).

■■ It is immaterial to the prejudice visited upon Christopher by virtue of Phillip's antagonistic defense that Christopher did not similarly attempt to place the blame on Phillip. (*People v. Bean* (1985), 109 Ill. 2d 80, 93-94, 485 N.E.2d 349, 356.) We conclude that it was

reversible error to deny Christopher's motion to sever, and that he was prejudiced by the joint trial. For this reason, we reverse Christopher's conviction and remand his case for a new trial. However, the fact that we now reverse Christopher's conviction for improper denial of severance does not require reversal of Phillip's conviction as well. (See *People v. Murphy* (1981), 93 Ill. App. 3d 606, 417 N.E.2d 759.) Clearly, had the trial judge granted the motions for severance in the first instance, Phillip would not have been tried jointly with Christopher. Nonetheless, for the joint trial to require reversal of Phillip's conviction as well as Christopher's, Phillip must demonstrate that his defense was antagonistic to Christopher's and that he was prejudiced by their being tried together.

■ One possible prejudice to Phillip from the joint trial would come from introduction of Christopher's pretrial confession. As noted earlier, introduction of a codefendant's confession might implicate the sixth and fourteenth amendment rights of an accused to confront witnesses. (See *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.) The State, citing *Parker v. Randolf* (1979), 442 U.S. 62, 69-77, 60 L. Ed. 2d 713, 721-26, 99 S. Ct. 2132, 2137-41 (plurality opinion of Rehnquist, J.), argues that the out-of-court statements were "interlocking confessions" and therefore do not implicate the confrontation clause. (See also *People v. Davis* (1983), 97 Ill. 2d 1, 21, 452 N.E.2d 525, 534-35. But see *Lee v. Illinois* (1986), 476 U.S. 530, 90 L. Ed. 2d 514, 106 S. Ct. 2056.) However, Christopher testified at trial, and was subject to full cross-examination by Phillip. In such a situation, the sixth amendment right of confrontation is not implicated by admission of the out-of-court statement. (*Nelson v. O'Neil* (1971), 402 U.S. 622, 29 L. Ed. 2d 222, 91 S. Ct. 1723. See also *People v. Morris* (1980), 79 Ill. App. 3d 318, 398 N.E.2d 38.) Consequently, it is clear that joint trial and admission of Christopher's out-of-court statement did not deprive Phillip of his rights under the confrontation clause.

■ Moreover, where a codefendant's out-of-court statements would be admissible at separate trials, the introduction of the evidence in a joint trial is not error. (*People v. Edwards* (1984), 128 Ill. App. 3d 993, 1004, 471 N.E.2d 957, 965-66.) In the present case, Christopher's statement added weight to Phillip's out-of-court admission, and thus rebutted Phillip's testimony that his own statement was false and the product of police coercion. While not admissible as a statement in furtherance of a conspiracy (see *People v. Cart* (1981), 102 Ill. App. 3d 173, 181-82, 429 N.E.2d 553, 561, *cert. denied* (1982), 459 U.S. 942, 74 L. Ed. 2d 199, 103 S. Ct. 255), Christopher's state-

ment might be nonhearsay if it were offered at Phillip's trial simply to impeach Phillip's testimony that his parallel statement was unreliable. (*Cf. Tennessee v. Street* (1985), 471 U.S. 409, 85 L. Ed. 2d 425, 105 S. Ct. 2078 (allowing admission of accomplice's confession to rebut defendant's testimony that his own confession was coercively derived from the accomplice's statement).) We do not decide whether Christopher's statement would have been admissible in a separate trial of Phillip. We hold simply that Phillip has failed to demonstrate, as is his burden, that publication of the statement to the jury was a direct result of the denial of his severance motion.

■ Furthermore, even if Christopher's statement would not have been admitted at Phillip's separate trial, that simple fact does not, in and of itself, compel reversal of Phillip's conviction obtained from an improper joint trial. (See *People v. Columbo* (1983), 118 Ill. App. 3d 882, 942-43, 455 N.E.2d 733, *cert. denied* (1984), 467 U.S. 1208, 81 L. Ed. 2d 351, 104 S. Ct. 2394.) In *People v. Cole* (1985), 131 Ill. App. 3d 36, 475 N.E.2d 620, the defendants were convicted at a joint trial of murdering a man on the street, purportedly in retaliation for another slaying. As in the case of the defendants here, each gave exculpatory testimony contradicting his own out-of-court statement, which was also admitted. Both defendants agreed that they had been together the evening in question and had encountered some men on the street. Defendant Cole testified that he left before the shooting and did not look back; codefendant Scott claimed at trial that the victim attacked him with a knife, forcing him to shoot in self-defense. As in the instant case, the jury was instructed to consider each out-of-court statement only against the defendant who made it. The court affirmed both convictions, stating:

> "While each defendant did, in effect, 'protest his innocence' in his trial testimony, Scott by claiming self-defense and Cole by claiming withdrawal, neither accused the other of committing murder. *** As succinctly stated by the State, '[D]efendant asks this Court to assume that because each defendant was impeached with his own pretrial confession in which he implicated his co-defendant, the jury must have focused solely on this impeachment evidence, defied instructions to the contrary and used each defendant's pretrial statement as substantive evidence of the guilt of the other defendant.' Further, defendants must argue that the jury would not have convicted them absent the improperly considered impeachment evidence. Both arguments are erroneous and entirely inconsistent with one of the basic assumptions underlying the theory of the jury trial, that

the jury is able to follow instructions." (131 Ill. App. 3d 36, 42, 475 N.E.2d 620, 624-25.)

We find that Phillip was not prejudiced by the admission of Christopher's out-of-court statements at their joint trial.

■■ Having found no harmful effect from admission of Christopher's out-of-court statement at Phillip's trial, we must still consider whether Phillip was prejudiced by Christopher's testimony, which contradicted his own. Phillip's counsel made motions to sever before trial started, and explained to the judge that his defense would be that Phillip sat in the car while his brother committed the criminal acts. At this point, the real possibility existed that Christopher would attempt to pin the blame for the entire crime on Phillip, since Phillip was willing to place himself at the scene. In *People v. Bean* (1985), 109 Ill. 2d 80, 485 N.E.2d 349, as in the present case, the appellant, Bean, was placed at the scene of the murder, while the other defendant, Byron, contended that he was not even present. Before trial, Bean's attorney requested severance, predicting that with the use of an alibi defense Byron would attempt to place all of the blame for the murder on Bean. Our supreme court held that the trial judge committed reversible error in denying the motion. In his opening statement, Byron's counsel had noted that Bean had left Illinois after the crime, while Byron had not, and commented that "the innocent remain and the guilty flee." Byron's attorney also stated that Byron was going to take the stand because an innocent man cannot wait to tell his story, while a guilty man will never take the stand. During closing argument, Byron's counsel stated that Bean never told alleged co-conspirators that he needed partners, and that Bean was a con man, a murderer and an extortionist. Counsel noted that the victim was murdered, then added, "I don't think there can be any doubt that Harold Bean is the one who killed her." Our supreme court reversed Bean's murder conviction, holding that the trial judge erred in denying Bean's motion for severance before trial. The court added that the occurrences at the trial noted above demonstrated the harm that can result from improper denial of severance.

In contrast, in this case, Christopher's counsel did not argue at trial that Phillip must have been the perpetrator because he admitted being at the Russell house, and during its closing argument the State did not even mention the differences between Phillip's and Christopher's testimony. Although Christopher's counsel did cross-examine Phillip, he simply got Phillip to agree that Christopher had sometimes been convinced about some things, only to be later proved wrong, and to state that when he saw Christopher on August 30 he

did not remember seeing a gun. Counsel asked, "[h]ow about that gun that you had?" and Phillip answered, "I don't own a gun." Christopher's counsel asked no cross-examination questions that could have harmed Phillip's defense.

A judge faced with the arguments made by Phillip's counsel before trial could have quite properly granted a motion to sever in anticipation of likely prejudice. The judge in this case failed to do so, however, so we need not anticipate whether prejudice would occur because we have the trial record and we can see clearly that the anticipated problems did not come to fruition. Unlike the cases discussed above, the present trial simply produced no "spectacle" allowing the State to sit by while Christopher's counsel attempted to destroy Phillip's case.

■ ▓▓ Another form of prejudice might occur when joint trials prevent counsel from presenting the kind of defense that would be used if the defendant were tried alone. In *People v. Rose* (1932), 348 Ill. 214, 180 N.E. 791, two defendants, Rose and Eckford, were convicted of murder and sentenced to death for shooting a railroad policeman who interrupted their roadside robbery attempt. Before trial, their attorneys made motions for separate trials and filed affidavits that Rose would argue that the victim was shot by Eckford without the consent or assistance of Rose, but that Eckford would testify that he was not present at the time of the shooting. Our supreme court reversed Rose's conviction, noting, "[a]s stated in their brief, 'defendants' counsel were put to the task of presenting two inconsistent defenses to the same jury. It could not be done. Counsel followed their best judgment and put Eckford on the witness stand and did not permit Rose to testify. It may be that in doing so counsel did not perform their full duty to defendant Rose.' " (348 Ill. 214, 217, 180 N.E. 791.) Phillip's counsel, however, does not now suggest how the trial strategy would have been different here had Phillip been tried separately.

▓▓ Finally, Phillip testified that he and Christopher were both present at the scene and that Christopher committed most of the criminal acts, while Christopher testified that he was never at the Russell house on the day in question. Such a contradiction in testimony may have adversely affected the jury's feelings about Phillip's credibility, and it is unlikely that the State would have been able to call Christopher to testify at a trial of Phillip alone. However, in *People v. Murphy* (1981), 93 Ill. App. 3d 606, 417 N.E.2d 759, discussed above, two defendants were tried jointly and found guilty of armed robbery. One defendant, Bell, testified that he spent the entire evening on which the crime occurred at home. His codefendant, Murphy,

testified that he and Bell had been present at the scene of the crime, but that he was away from the victim. Murphy did testify, however, that he saw Bell talking to the victim, and that Bell later gave him her car keys. The appellate court refused to reverse Murphy's conviction, although it reversed Bell's conviction at the joint trial. The court stated, "[a]lthough Bell's alibi defense may have been inconsistent or contradictory to that of Murphy's testimony, it was not antagonistic." (93 Ill. App. 3d 606, 610, 417 N.E.2d 759, 762.) Genuine hostility between two defenses is often required to obtain reversal because of antagonism. See *People v. Poree* (1983), 119 Ill. App. 3d 590, 594, 456 N.E.2d 950, 954 (stating that antagonistic defenses have been confined to instances where one defendant testifies implicating another); *People v. Columbo* (1983), 118 Ill. App. 3d 882, 940, 455 N.E.2d 733 ("To characterize defenses as antagonistic, there must be a showing of true conflict"), *cert. denied* (1984), 467 U.S. 1208, 81 L. Ed. 2d 351, 104 S. Ct. 2394.

Absent some showing of an effect on trial strategy or of exploitation by the State or counsel for codefendant, the cases have generally held that mere contradiction in testimony of two defendants as to what happened on the day of the crime does not render defenses sufficiently antagonistic to constitute reversible error. (See, *e.g.*, *People v. Edwards* (1984), 128 Ill. App. 3d 993, 1001, 471 N.E.2d 957; *People v. Sanchez* (1982), 110 Ill. App. 3d 893, 904, 443 N.E.2d 252, 260.) We conclude that the failure to sever does not entitle Phillip to a new trial.

II

■■■ Defendants next argue that their convictions of aggravated arson (Ill. Rev. Stat. 1985, ch. 38, par. 20−1.1(a)(1)) must be reversed. We agree. In *People v. Johnson* (1986), 114 Ill. 2d 69, our supreme court struck down subsection (a)(1) of the aggravated-arson statute as unconstitutional. This subsection imposes more severe penalties for setting fire to a building knowing that a person is inside than are imposed for committing simple arson. The court noted that the offense of aggravated arson, by its very name, was intended to define an aggravated form of the offense of arson. However, the crime could not be considered a lesser included offense of arson because the *mens rea* required for arson was greater. In contrast to the arson statute, the absence of any description of criminal intent in the aggravated-arson statute could impermissibly lead to punishment of conduct not necessarily criminal in nature. The court found controlling its decision in *People v. Wick* (1985), 107 Ill. 2d 62, 481 N.E.2d 676, invalidating

subsection (a)(3) of the same statute, which prohibited knowingly damaging a building by fire and thereby injuring a police officer or fire fighter. In *Wick*, the court stated that a farmer burning his deteriorated barn to clear space could be convicted of aggravated arson if the fire got out of hand and a fireman was injured. The fact that the type of conduct for which defendants were convicted, setting fire to a building while knowing that a person is inside, might be characterized as more culpable than the conduct outlawed in subsection (a)(3) is not a sufficient basis for upholding the former subsection of the aggravated-arson statute while invalidating the latter. See *People v. Johnson* (1986), 114 Ill. 2d 69.

▆▆ The State argues, nonetheless, that defendants do not have standing to assert that the statutory definition of aggravated arson lacks the essential element of intent because there was overwhelming evidence in this case that defendants did have criminal intent. An identical argument made by the State was rejected in *People v. Palmer* (1986), 141 Ill. App. 3d 234, 490 N.E. 2d 154. We reject it here as well. Defendants were never indicted for simple arson. (Compare *People v. Clark* (1986), 114 Ill. 2d 450.) Consequently, we must reverse defendants' convictions for aggravated arson, and vacate the sentences imposed for violation of that statute.

### III

▆▆▆ Phillip next argues that the police lacked probable cause to arrest him. The police went to the Lekas home after George Lekas admitted his own involvement in the crime and implicated his brothers. Phillip argues that, other than George's statements, the police had nothing to connect him even remotely to the offenses. In support of suppression, Phillip cites *People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046, in which this court found an absence of probable cause to support defendant's arrest and therefore reversed the defendant's murder conviction because his in-custody statements had been placed into evidence. An informant, while in custody, told police that the defendant and his brother had admitted their participation in an armed robbery and murder at a liquor store, and that they had displayed a gun and holster that matched the description of those allegedly taken from the victim. This court held that the informant's statements, standing alone, were insufficient to provide police with probable cause to arrest defendants. Similarly, Phillip argues that his arrest was made without probable cause because George was part of the criminal milieu, and his reliability had not been previously established, and because he was under arrest for the same offense for

which Christopher and Phillip were later charged.

The existence of probable cause is not governed by technical legal rules but by commonsense considerations which are factual and practical. (*People v. Tisler* (1984), 103 Ill. 2d 226, 236, 469 N.E.2d 147.) After this court's decision in *Sturdivant*, the United States Supreme Court made clear that an informant's veracity, reliability, and basis of knowledge are all highly relevant in determining the value of a tip, but should not "be understood as entirely separate and independent requirements to be rigidly exacted in every case." (*Illinois v. Gates* (1983), 462 U.S. 213, 230, 76 L. Ed. 2d 527, 543, 103 S. Ct. 2317, 2328.) Rather, the existence of probable cause must be determined from the totality of the circumstances. (462 U.S. 213, 238, 76 L. Ed. 2d 527, 548, 103 S. Ct. 2317, 2332.) Probable cause for an arrest exists when the facts and circumstances known to the police would justify the belief, in a person of reasonable caution, that the person arrested has committed an offense. (*People v. Lumpp* (1983), 113 Ill. App. 3d 694, 704, 447 N.E.2d 963, 970.) The police need not have sufficient evidence to convict, but the information must lead to more than mere suspicion (113 Ill. App. 3d 694, 704, 447 N.E.2d 963, 970), and it must tie the particular individual arrested, rather than another, to the specific crime (*People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 373, 425 N.E.2d 1046, 1049). When an arrest is made without a warrant, the standards used to review the probable-cause assessment made by the police officers are as stringent as those to be applied in reviewing the determination made by a magistrate. (*People v. Johnson* (1983), 94 Ill. 2d 148, 445 N.E.2d 777.) The mere fact that an informant is himself a suspect in a homicide investigation, which would give him an incentive to cooperate with the police, does not automatically destroy the reliability of his statements implicating another (see *People v. Mitchell* (1984), 123 Ill. App. 3d 868, 873, 463 N.E.2d 864, 870); rather, it is simply a factor to be considered in assessing the totality of the circumstances (123 Ill. App. 3d 868, 873, 463 N.E.2d 864, 870). Moreover, a trial court's finding that probable cause existed will not be overturned unless it is manifestly erroneous. *People v. Clay* (1973), 55 Ill. 2d 501, 505, 304 N.E.2d 280, 282.

The trial judge found that the police had probable cause to arrest the defendants when they did. While in custody, George had admitted to police that Phillip had called him at the bowling alley. He later told the officers that his brothers knew of his bowling date with Leo Russell, that they owed Russell money and earlier had been to his house. George stated that he had overheard his brothers talking about "ripping Leo off and stealing his coin collection." The police then

went to the Lekas home to arrest Christopher and Phillip.

Phillip now argues that the police had nothing to connect him even remotely to the offense other than George's statement that at some unspecified time his brothers had spoken of stealing from Russell. The fourth amendment to the United States Constitution prohibits police from arresting persons on the basis of "mere suspicion" (*Dunaway v. New York* (1979), 442 U.S. 200, 213, 60 L. Ed. 2d 824, 836, 99 S. Ct. 2248, 2257), or for the purposes of investigation, "in the hope that something might turn up" (*Brown v. Illinois* (1975), 422 U.S. 590, 605, 45 L. Ed. 2d 416, 428, 95 S. Ct. 2254, 2262). We need not resolve the close question of whether the trial judge's probable-cause determination was manifestly erroneous in this case. The simple fact that Phillip's arrest was made without probable cause does not mean that all statements made by Phillip while in police custody are *per se* excludable. (See *People v. Travis* (1984), 122 Ill. App. 3d 671, 676, 462 N.E.2d 654, 658.) The trial court found that even if probable cause had been lacking at the time of Phillip's arrest, the connection between Phillip's arrest and his inculpatory statement was sufficiently attenuated to purge any taint of illegality.

To establish that a statement made by a suspect in custody is admissible, notwithstanding an illegal arrest, the State must show that the statement was a product of the defendant's free will, independent of any taint of the illegal arrest. (See *Wong Sun v. United States* (1963), 371 U.S. 471, 486, 9 L. Ed. 2d 441, 454, 83 S. Ct. 407, 416-17 (in which case the Supreme Court framed the issue in an analogous situation by quoting from Maguire, Evidence of Guilt 221 (1959) " '[W]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " (*Wong Sun v. United States* (1963), 371 U.S. 471, 488, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417)); see also *People v. Tankson* (1980), 92 Ill. App. 3d 328, 331, 415 N.E.2d 1218, 1221.) This is, of course, a requirement distinct from the "threshold requirement" of the due process clause that a confession be voluntary and not by the product of coercion or promises (*cf. Brown v. Mississippi* (1936), 297 U.S. 278, 80 L. Ed. 682, 56 S. Ct. 461), and it is an analysis separate from the prophylactic rules of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, which are designed to implement the constitutional strictures against compelled self-incrimination. (See *Lanier v. South Carolina* (1985), 474 U.S. 25, 88 L. Ed. 2d 23, 106 S. Ct. 297; *Taylor v. Alabama* (1982), 457 U.S. 687, 690, 73 L. Ed. 2d 314, 319, 102 S. Ct.

2664, 2667.) The giving of *Miranda* warnings, although one factor to consider in determining whether statements are the product of an illegal arrest, will not guarantee the admissibility of statements made while in custody. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) Other factors to be considered are the passage of time between the arrest and confession, the presence of intervening circumstances, and the purpose and flagrancy of police misconduct. 422 U.S. 590, 603-04, 45 L. Ed. 2d 416, 427, 95 S. Ct. 2254, 2261-62.

 It is undisputed that the police had no warrant when they roused Phillip from his bed and took him to the police station. "[T]he Fourth Amendment to the United States Constitution *** prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest." (*Payton v. New York* (1979), 445 U.S. 573, 576, 63 L. Ed. 639, 644, 100 S. Ct. 1371, 1374-75.) The trial court determined that exigent circumstances justified the warrantless arrests, citing the seriousness of the crime and the risks that defendants would escape or destroy evidence. We take no position on the correctness of this conclusion. However, we do note that an inordinate delay during which a warrant could have been obtained undercuts claims of justification for entering a dwelling and making an arrest without a warrant. (*People v. Henderson* (1981), 96 Ill. App. 3d 232, 421 N.E.2d 219.) In this case, the police first obtained George's statement at 10:30 p.m., but waited almost six hours before acting on it. Such a lax attitude strongly belies the State's argument that an exigency existed. Moreover, in *People v. Wormack* (1980), 91 Ill. App. 3d 169, 414 N.E.2d 177, there was no evidence that the suspects were armed at the time, or that they would flee during the time needed to obtain a warrant. The court held that no exigent circumstances existed and suppressed evidence obtained from the arrest. Acting without a warrant, police in that case forced open the outer door of an apartment building at 2 a.m., and apprehended armed-robbery suspects. The court added that the fact that the arrest was effected at 2 a.m. " 'raises particular concern over its reasonableness.' This is especially true as the arrest occurred in Cook County, where nighttime warrants are available." 91 Ill. App. 3d 169, 172, 414 N.E.2d 177, 180.

 On the other hand, when they have probable cause, the police are constitutionally permitted to make warrantless daytime arrests of suspected felons in public places (*United States v. Watson* (1976), 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820), and a doorway to a house is considered a "public place" in which there is no expectation of privacy. (*United States v. Santana* (1976), 427 U.S. 38, 49 L.

Ed. 2d 300, 96 S. Ct. 2406.) Warrantless arrests supported by probable cause are valid even if the arrestee came to the door as a result of police efforts. (See *People v. Graves* (1985), 135 Ill. App. 3d 727, 731, 482 N.E.2d 223, 225; *People v. Morgan* (1983), 113 Ill. App. 3d 543, 547, 447 N.E. 2d 1025, 1028.) The trial court found that Phillip was standing on the porch when he was arrested, and Phillip does not argue that special considerations apply because the arrest was made at night. Thus, Phillip's warrantless arrest satisfied the requirements of *Payton*.

However, as noted, the flagrancy of police misconduct is one factor to be considered in determining the likelihood that the connection between an arrest without probable cause and a subsequent confession has been attenuated. As the Supreme Court has stated, one purpose of the warrant requirement is "to interpose the magistrate's determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law." (*Payton v. New York* (1979), 445 U.S. 573, 602-03, 63 L. Ed. 2d 639, 660-61, 100 S. Ct. 1371, 1388.) That the police did not attempt to get a warrant, and thereby avoided testing the strength of their evidence before a judicial officer, may be a strong indication that they did not feel that they had probable cause to believe in defendant's guilt, and may indicate that the police took Phillip and Christopher from their homes before dawn in the simple hope that something might turn up.

The State in its brief, in supporting the admission of Phillip's statements, does not give us the benefit of its views as to the effect that the failure to seek a warrant should have on our analysis of the attenuation doctrine. Indeed, in its discussion of the probable-cause issue, the State fails to distinguish between evidence obtained before and after Phillip's arrest. Rather, citing *People v. Tisler* (1984), 103 Ill. 2d 226, 236, 469 N.E.2d 147, the State makes the astounding argument that the Illinois Supreme Court has eliminated the warrant requirement altogether, so long as the police have probable cause to make an arrest. As noted above, such is not the case. The arrest in *Tisler* was patently distinguishable from the present case, because it was made on a public street, not a home, was based on an informant's tip that the defendant was about to sell drugs that were then in his possession, and the arresting officer made many attempts to communicate with a judge at home to sign a warrant. 103 Ill. 2d 226, 236, 469 N.E.2d 147, 151-52.

■■■ Despite Phillip's forceful argument that probable cause was lacking, and despite the absence of any effective rebuttal by the State, we affirm the trial court's conclusion that Phillip's statements were admissible because they were purged of any taint of any possible illegality in his arrest. From the time of his arrest and throughout the following day, Phillip remained in custody, but he did not make his recorded statement until about 5:14 p.m. This was at least 12 hours after his arrest. We do not deem a break in time as a sufficient factor, standing alone, to purge the taint of any prior illegality. A lapse of time is a factor which cuts both ways in analyzing attenuation. It may serve to amplify the coercion latent in the custodial setting, particularly when there are other indicia of coercion. (See *People v. Townes* (1982), 91 Ill. 2d 32, 435 N.E.2d 103); equally, it may help to purge the taint of a prior illegality by allowing an accused to reflect on his situation, particularly when attended by other factors ameliorating coercion, such as *Miranda* warnings. (See *People v. Finch* (1980), 86 Ill. App. 3d 493, 403 N.E.2d 87; *People v. Gabbard* (1979), 78 Ill. 2d 88, 398 N.E.2d 574.) By the time that Phillip gave his statement, the police had gone to the Clayton Motel, where a desk clerk identified Phillip and Christopher as having recently been there with George, just as George had described. Had this new information supplied the missing probable cause to believe that Phillip committed the crime, one could question the wisdom of requiring police to go through the formality of releasing him, only to rearrest him outside the jailhouse door. There is no indication that the follow-up investigation at the motel was prompted by anything that Phillip said.[1] The police then questioned Phillip based on the new information that they had obtained.

The confrontation of an arrestee with new information, untainted by the illegal arrest, has been identified as an intervening circumstance that may produce a voluntary desire to confess and thereby support admission of in-custody statements. For example, in *People v. Gabbard* (1979), 78 Ill. 2d 88, 398 N.E.2d 574, the defendant was illegally arrested on unrelated charges, and was eventually convicted of burglary and armed robbery based in part on statements he made while in custody. Our supreme court held that the defendant's subsequent in-custody statements were not the product of his illegal arrest, stating:

> "The evidence also shows that the defendant's statements were prompted by intervening events. Early in the interrogation

---

[1]Neither George's statement (which was suppressed at his separate trial as the product of an improper police promise to set him free) nor Christopher's statement, both used to confront Phillip, were the fruits of Phillip's arrest.

the defendant was shown the sketch which had been prepared prior to his arrest, and he acknowledged that it resembled him. Prior to the lineup he also impliedly admitted his involvement in the robbery by volunteering to cooperate in the prosecution if a favorable arrangement for serving his sentence should be reached. In addition, when the defendant, immediately preceding his inculpatory account of the robbery, was told that he had been identified by each of the viewers at the lineup, he responded to that information by stating that he was not surprised." 78 Ill. 2d 88, 99, 398 N.E.2d 574, 579.

Similarly, in *People v. Finch* (1980), 86 Ill. App. 3d 493, 408 N.E.2d 87, 90, the Second District concluded that even if the police did not have probable cause to arrest defendant, his statements were properly admitted, in his trial for murder and armed robbery, where the gap between the arrest and confession was seven hours; *Miranda* warnings were properly given; and the confession was prompted in part by his having been advised by officers that a gun was missing from his sister's apartment and that there were discrepancies between his statements and those of other persons as to his whereabouts. Likewise, in *People v. Tankson* (1980), 91 Ill. App. 3d 328, 332, 415 N.E.2d 1218, 1220-21, knowledge that the results of a police investigation contradicted defendant's varying alibi accounts was held to be a significant intervening circumstance between statements and an illegal arrest. See also *People v. Malloy* (1982), 104 Ill. App. 3d 605, 607-08, 432 N.E.2d 1291, 1293; *In re R.S.* (1981), 93 Ill. App. 3d 941, 419 N.E.2d 195.

Finally, in the present case, each time the police questioned Phillip, the judge found, they restated the *Miranda* warnings. While the giving of these warnings is not controlling in the assessment of the connection between an illegal arrest and a defendant's statements, it is still one factor to be considered in helping to dissipate the taint. *Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.

A trial judge's decision on a motion to suppress, including his or her finding under the attenuation doctrine, will not be overturned unless manifestly erroneous. (*People v. Davis* (1980), 86 Ill. App. 3d 557, 562, 407 N.E.2d 1109, 1114-15.) We are not asked to decide whether we would have reached the same conclusion in the first instance. (*People v. Clay* (1984), 124 Ill. App. 3d 140, 463 N.E.2d 929.) We conclude that the judge's finding that Phillip's statement was sufficiently attenuated from his arrest to have been the independent product of Phillip's free will was not manifestly erroneous. We find no reversible error with regard to the admission of Phillip's statement.

IV

A judge is authorized to impose a sentence greater than the maximum otherwise authorized for the most serious conviction if the factors set forth in aggravation are or were present. (Ill. Rev. Stat. 1981, ch. 38, par. 1005—5—3.2(b).) Ordinarily, the maximum term for murder would be 40 years (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(3)), but the judge sentenced Phillip to a 45-year extended term on that count. Phillip argues that this was improper because the judge did not find that the crime was exceptionally brutal or heinous. (See *People v. Lenninger* (1980), 88 Ill. App. 3d 801, 410 N.E.2d 1157.) However, this precise language need not be recited as a formal incantation to justify imposition of an extended-term sentence. (See *People v. Clay* (1984), 124 Ill. App. 3d 140, 155, 463 N.E.2d 929, 940.) The judge noted that the crime "indicated *** totally willful and wanton disregard of human life." The victim was bound and gagged, and she was shot in her own home. Moreover, the victim was over 60 years of age, and that would have warranted imposition of an extended term under subsection (b)(3)(ii) of the same statute (Ill. Rev. Stat. 1981, ch. 38, par. 1005—3.2(b)(3)(ii)). Phillip further argues that the extended-term sentence was an abuse of discretion because he was 19 at the time of his arrest, had no prior convictions, and the State's evidence showed that he did not shoot Mrs. Samp. However, our supreme court has authorized imposition of extended-term sentences for defendants found guilty under an accountability theory. (*People v. Jordan* (1984), 103 Ill. 2d, 192, 215, 469 N.E.2d 569, 580.) Christopher, the actual trigger man, was given a proportionately greater 70-year sentence. We find that the judge did not abuse his discretion in imposing an extended-term sentence of 45 years on Phillip's murder conviction.

The judgments of conviction on all counts against Christopher Lekas are reversed and remanded for a new trial. The conviction and sentence of 45 years' imprisonment of Phillip Lekas for murder is affirmed, as is the conviction and sentence of 30 years for armed robbery. Phillip Lekas' conviction of aggravated arson is reversed and the sentence vacated on that charge.

No. 84—0873 Reversed and remanded.

No. 84—0970 Affirmed in part, reversed and vacated in part.

STAMOS and HARTMAN, JJ., concur.